UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARTIN JAKUBOWSKI, M.D.,     :      NO. 1:08-CV-00141
                                     :
        Plaintiff,            :
                                       :
    v.                      :          **OPINION AND ORDER**
                                       :
                                       :
THE CHRIST HOSPITAL,         :
     et al.,                  :
                                       :
        Defendants.         :

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 28), Plaintiff's Response in Opposition (doc. 43), and Defendants' Reply (doc. 60). For the reasons indicated herein, the Court GRANTS Defendants' Motion and DISMISSES this matter from the Court's docket.

## I. Background

This matter arises from Defendant The Christ Hospital's ("TCH") removal of Plaintiff Dr. Martin Jakubowski from its Family Medical Residency Program ("FMRP") in August 2007 (doc. 43). Plaintiff alleges Defendants TCH and Dr. Phillip Diller, the director of TCH's FMRP, denied him reasonable accommodation and removed him for his disability, Asperger's Syndrome[1] (Id.).

---

[1] Section 299.80 of the Diagnostic and Statistical Manual of Mental Disorders describes "the essential features of Asperger's

Plaintiff, a 2003 graduate of the University of Medical Sciences in Poznan, Poland, started his medical career with a civilian residency in July 2005 at St. Elizabeth Hospital in Youngstown, Ohio (Id.). As Plaintiff explains in his briefing, he obtained the residency at St. Elizabeth through the "scramble" process, under which prospective residents who did not find a residency program through the "match" process compete for a number of left-over residency positions (Id.). Plaintiff struggled with clinical practice at St. Elizabeth, and the director at St. Elizabeth placed him on a remediation program in October 2005 (Id.). Despite the remediation program, Plaintiff continued to struggle and in June 2006, St. Elizabeth informed Plaintiff it would not renew his contract for a second year (Id.).

At the time, Plaintiff attributed his struggle with clinical practice to insufficient clinical training from his foreign medical school, so he decided to enroll in a program of supervised clinical training at New York Medical College ("NYMC")

_____

Disorder" as "severe and sustained impairments in social interaction." The disorder causes "clinically significant impairment in social, occupational, or other important areas of functioning." Asperger's Syndrome is continuous, lifelong, "severe and defined in the same way as Autistic Disorder." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatic Association, 2000, pp. 80-84.

(Id.).  At NYMC, Plaintiff completed a series of two-to-four week rotations in various fields of medicine (Id.).  Those evaluating his work during this time gave both positive and negative feedback (Id.).  The written portions of the negative evaluations focused on communication problems as Plaintiff's primary deficiency (Id.).

Plaintiff attempted again, unsuccessfully, to match into a residency program for the 2007 residency year (Id.).  Plaintiff contacted Defendant TCH in March 2007, through the scramble process, and after an interview with Dr. Diller, obtained a position in TCH's FMRP (Id.).

In July 2007, Plaintiff began an orientation for his TCH residency (Id.).  During the orientation, Plaintiff participated in supervised patient encounters, underwent testing for medical knowledge and emotional intelligence, and attended some educational programs (Id.).  Plaintiff's supervisors identified some weaknesses in Plaintiff's patient encounters; however, Plaintiff's overall reviews in this area suggested a satisfactory performance (Id.).  In the medical knowledge test, Plaintiff placed in the 90th percentile among all first-year residents in the country from the previous year (Id.).  In the emotional intelligence exam, Plaintiff performed poorly (Id.).

At the end of the orientation month, Dr. Diller,

3

suspecting Plaintiff might be suffering from a cognitive disorder, referred Plaintiff to a psychologist, Dr. Hartmann, with the request that Hartmann rule out Asperger's Syndrome (Id.). According to Plaintiff's briefing, his first rotation at TCH did not begin well, thanks in part to the fact Dr. Diller had sent him for a psychological evaluation (Id.). Moreover, in Plaintiff's view, he was left to be supervised by a doctor with little teaching experience, he was assigned with an allegedly very weak first-year resident from the Ukraine, and no one took into account Dr. Diller's suspicion that Plaintiff suffered from Asperger's Syndrome (Id.).

Yet another attending physician, Dr. Ellis, supervised Plaintiff during the first week of August 2007, and rated Plaintiff's performance poorly (Id.). At that time, Dr. Ellis suggested Plaintiff be placed on remediation immediately (Id.). Dr. Ellis noted that Plaintiff's medical knowledge was average to below average and commented that Plaintiff "[o]ften get[s] stuck on one diagnosis and does not explore other possibilities" (Id.). As for Plaintiff's communication skills, Dr. Ellis noted that "[n]urses often do not know what he is trying to relate. He had difficulty even answering a phone call and taking a message at the start of the month. He is often harsh and short on the phone to nurses as well as physician consultants" (Id.).

Plaintiff continued to struggle in the program, and Drs. Bernheisel and Schlaudecker documented a handful of mistakes relating to communication problems (Id.). Plaintiff questions the validity of the criticism, and argues that the record shows he never harmed a patient (Id.). Plaintiff argues that Dr. Bernheisel could not specifically identify the most dangerous thing that Plaintiff had done, despite Bernheisel's claim that Plaintiff had been watched closely as Plaintiff could not be trusted, and Plaintiff's dangerous orders were caught before they were administered (Id.).

On August 24, 2007, Dr. Bernheisel told Plaintiff that Plaintiff had failed his inpatient rotation and would have to repeat it (Id.). The next day, Dr. Hartmann conclusively diagnosed Plaintiff with Asperger's Syndrome (Id.). The following Monday, August 27, 2007, Plaintiff received a letter from Dr. Diller, informing Plaintiff that he would be terminated, effective September 30, 2007 (Id.). That same day, Plaintiff met with Drs. Diller, Bernheisel, and Schlaudecker, at which time Plaintiff raised the issue of his recent diagnosis of Asperger's Syndrome (Id.).

Two weeks later, on September 11, 2007, Plaintiff, through Counsel, requested by letter the accommodation for his disability of "knowledge and understanding" (Id.). In

Plaintiff's view, he could "be successful if all the professionals around him are made aware of his condition, its symptoms, and its triggers" (Id.). Shortly thereafter, Plaintiff and his Counsel met with Dr. Diller, who rejected their request for the requested accommodation, stating the program lacked the necessary resources (Id.). On September 13, Dr. Diller confirmed by letter that Defendants could not provide the requested accommodation, and offered to help Plaintiff find a pathology position, if Plaintiff would forego the appeal of his dismissal (Id.). Plaintiff opted to appeal his dismissal, which he ultimately lost on December 18, 2007 (Id.).

On February 27, 2008, Plaintiff filed the instant Complaint alleging Defendants discriminated against Plaintiff in violation of the Americans with Disabilities Act, the Rehabilitation Act, and Ohio Rev. Code § 4112.02 by failing to provide a reasonable accommodation for his disability and for removing him from the program because of his disability (doc. 1).

## II.  **The Summary Judgment Standard**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by

merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative

evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir.1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. <u>See Matsushita</u>, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. <u>See</u> <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**III.  Applicable Law**

Plaintiff alleges Defendants discriminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, the Rehabilitation Act, 29 U.S.C. § 794, and Ohio Revised Code § 4112.02 by failing to provide Plaintiff a reasonable accommodation for his disability and for removing him from the FMRP because of this disability (doc. 1). The Sixth Circuit has held Ohio disability discrimination claims employ the same analysis as ADA claims. <u>Kleiber v. Honda of Am. Mfg.</u>, 485 F.3d 862, 872 (6th Cir. 2007). Similarly, the Sixth Circuit has held that although the Rehabilitation Act and the ADA are not identical, cases construing one statute are instructive in construing the other. <u>Doe v. Woodford County Bd. of Educ.</u>, 213 F.3d 921, 925 (6th Cir. Ky 2000). As a result, the ADA analysis applies to Plaintiff's claims under the Rehabilitation Act, and Ohio Rev. Code § 4112.02.

## A.  The ADA Standard for Failure to Accommodate

The ADA defines discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." <u>Kleiber</u>, 485 F.3d 862, 868, <u>quoting</u> 42 U.S.C. § 12112(a); 42 U.S.C. 12112(b)(5)(A).  The ADA further defines "reasonable accommodation" as (1) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (2) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. <u>Kleiber</u>, 485 F.3d at 868, <u>quoting</u> 42 U.S.C. § 12111(9).  In other words, an ADA plaintiff generally bears the initial burden of proving (1) he is disabled; and (2) he is otherwise qualified for the position with a plaintiff-proposed objectively reasonable accommodation. <u>See</u> <u>Id</u>.

ADA regulations also indicate that in order to determine the appropriate reasonable accommodation, a covered employer has the responsibility to engage in an informal, interactive process to determine whether an accommodation is possible based on the essential functions of the employee's

position and employee's limitations.  <u>Geiger v. Pfizer, Inc.</u>,
2008 U.S. Dist. LEXIS 89238, 13-14 (S.D. Ohio Sept. 18, 2008)
citing 29 C.F.R. § 1630.2(o)(3).  Furthermore, the Sixth Circuit
has established that "the interactive process is mandatory, and
both parties have a duty to participate in good faith." <u>Kleiber</u>,
485 F.3d at 871.

      With regard to the reasonableness of a proposed
accommodation, the Sixth Circuit has held that each accommodation
requires a case-by-case factual analysis, and the trier of fact
must find that the accommodation is objectively reasonable." <u>Id</u>.
citing <u>Monette v. Elec. Data Sys. Corp.</u>, 90 F.3d 1173, 1187 (6th
Cir. 1996).  Once it is determined that the proposed
accommodation is objectively reasonable, "the defendant employer
then bears the burden of showing that the accommodation imposes
an undue hardship upon it, given the employer's specific
situation." <u>Id</u>.

### B.  The Standard for a Disability Discrimination Claim

      In addition to his ADA failure to accommodate claim,
Plaintiff asserts in this case a claim for discrimation, premised
on his removal from the residency program.  Plaintiff asserts
Defendants discriminated by failing to provide him with the same
opportunity for remediation as a similarly-situated resident on
account of his disability (doc. 1).  The Sixth Circuit addressed

a situation similar to this in <u>Jones v. Potter</u>, 488 F.3d 397, 403-06 (6th Cir. Ohio 2007), where the Plaintiff alleged his termination was based on improper motives relating to his race, gender, physical disabilities, and prior litigious activity against the United States Postal Service. There, the court held that in order to make a claim for discrimination, a Plaintiff must show: (1) that he is disabled; (2) that he is otherwise qualified to perform the job requirements with or without reasonable accommodation; (3) that he suffered an adverse employment action; (4) that his employer knew or had reason to know of their disability; and (5) that, following the adverse employment action, either he was replaced by a non-disabled person or his position remained open (or in the alternative) he was treated differently than similarly-situated employees. <u>Id</u>.

**IV. Discussion**

>  **A. Defendants' Motion for Summary Judgment (doc. 28)**

In their motion for summary judgment, Defendants argue there is no genuine issue of material fact and thus they are entitled to judgment as a matter of law as to Plaintiff's claims (doc. 28). Specifically, Defendants assert Plaintiff failed to establish (1) he is disabled, or that (2) he is "otherwise qualified" for the position of family practice medical resident

(Id. citing <u>Kleiber v. Honda of America MGF.</u>, 485 F.3d 862, 870 (6th Cir. 2007)).

As for their first argument, Defendants contend that because Plaintiff's Asperger's does not prevent him from working in all medical and/or science jobs, but only a limited number of specific jobs, he does not qualify as disabled, and has no ADA claim (<u>Id</u>.). In Defendants' view, Plaintiff has failed to prove he is disabled within the meaning of the ADA because he did not provide evidence he is inhibited by "a significant restriction from performing a class or a broad range of jobs in various classes" (<u>Id</u>. citing <u>Goldsmith v. Jackson Mem'l Hosp. Pub. Health Trust</u>, 33 F.Supp. 2d 1336 (S.D. Fla. 1998)).

Defendants devote the bulk of their arguments, however, to the question of whether Plaintiff is "otherwise qualified" to be a family practice medical resident. Defendants argue Plaintiff failed to prove "he can perform the essential functions of the job... in a way that does not endanger others" and also that Plaintiff failed to propose an objectively reasonable accommodation that makes him "otherwise qualified" (doc. 28, <u>citing</u> <u>Adams v. Rochester General Hospital</u>, 977 F. Supp. 226, 228 (W.D.N.Y. 1997)). Defendants contend that Plaintiff's requested

accommodation of "knowledge and understanding" among the TCH staff is unreasonable and ultimately fails to address Plaintiff's communication problems and the threat to patient safety (Id.).

Moreover, Defendants contend no reasonable accommodation exists that would eliminate the significant risks posed to patients by Plaintiff's Asperger's Syndrome (Id.). Defendants argue the only way to ensure patient safety would be to assign a doctor to monitor and oversee all of Plaintiff's actions and communications (Id.). Defendants argue such an accommodation is overly burdensome and is not required by the ADA (Id. citing Southeastern Community College v. Davis, 442 U.S. 397 (1979)). Defendants further argue under Kaltenberger v. Ohio College of Podiatric, 162 F.3d 432, 436 (6th Cir. 1998), that discrimination laws do not require an educational institution to make substantial modifications to accommodate a handicapped person (Id.). In the light of this case law and due to what Defendants view as Plaintiff's failure to provide support for his requested accommodation, Defendants contend Plaintiff failed to prove he is "otherwise qualified" to be in the FMRP (Id.).

Defendants next argue their decision to terminate Plaintiff was not based on any improper animus, but rather on the nature of their program and the potential risk to patients' safety (Id.). Defendants contend they acted in good faith when

they offered to help Plaintiff enter a pathology residency program as an alternative to the FMRP (<u>Id</u>.).

Finally, Defendants argue that Plaintiff misrepresented his experience at St. Elizabeth on his original application to their program. Under such circumstances, Defendants maintain their decision to terminate Plaintiff's employment should be entitled to deference, and request judgment in their favor as a matter of law.

## B. Plaintiff's Response in Opposition (doc. 43)

In response, Plaintiff argues he satisfied the requisite elements for an ADA discrimination claim by proving (1) he is disabled; and (2) his employer discriminated against him (doc. 43). Furthermore, Plaintiff alleges Defendants failed their duty to engage in the interactive process to develop and implement a reasonable accommodation for his participation in the residency program (<u>Id</u>.).

As for the issue of whether he qualifies as "disabled" within the meaning of the ADA, Plaintiff argues Asperger's Syndrome satisfies the definition of a disability because it substantially limits his major life activity of social interaction (<u>Id</u>.). As a result, Plaintiff contends Defendants were obligated to participate in the interactive process to identify a reasonable accommodation for his disability (<u>Id</u>.).

Here, Plaintiff argues a proposed accommodation need not be acceptable or even sufficient to enable the employee to be successful, as Plaintiff maintains any requested accommodation automatically triggers the duty for both parties to engage in a good faith exploration of possible accommodations (<u>Id</u>.).

Plaintiff contends Defendants failed to act in good faith after they were put on notice of his request for accommodation (<u>Id</u>.). Plaintiff asserts Defendants never discussed potential alternatives, accommodations, or additional resources, and also argues two other residents received more comprehensive and fair treatment in their residency programs than Plaintiff (<u>Id</u>.). Consequently, Plaintiff argues he did not have the opportunity to propose a more detailed plan and did not have a fair opportunity to seek possible accommodations such as those outlined in his experts' reports (<u>Id</u>.). Plaintiff claims these proposed accommodations, including educating the TCH staff about his condition, allowing him to seek psychological treatment to develop his social skills, providing him a mentor, and monitoring his patient encounters, could have addressed all his deficiencies and allowed him to be successful without the necessity of the monitoring by a second physician (<u>Id</u>.).

Finally, Plaintiff argues Defendants discriminated

against him by failing to provide the same opportunity for remediation as a similarly-situated resident on account of his disability (<u>Id</u>.). Plaintiff alleges Defendants treated "Dr. K___," a 2005 resident with similar performance problems, more favorably (<u>Id</u>.). Plaintiff argues the only difference between him and Dr. K___ was Plaintiff's disability (<u>Id</u>.). As such, because TCH treated a similarly situated non-disabled resident more favorably, Plaintiff argues he satisfies his burden for presenting a <u>prima</u> <u>facie</u> case of disability discrimination (<u>Id</u>.). Plaintiff further argues any proposed non-discriminatory reasons proffered by Defendants are pretext for illegal discrimination and contends he in no way concealed his St. Elizabeth experience from TCH (<u>Id</u>.). Given these material disputes of fact, Plaintiff submits summary judgment is inappropriate (<u>Id</u>.).

### C. Defendants' Reply in Support (doc. 60)

Defendants reply by arguing Plaintiff was and remains incapable of engaging in effective communication with patients as a result of his undisputed communication barrier (doc. 60). Defendants allege Plaintiff failed to propose a reasonable accommodation in 2007, and also argue none exists today that would adequately safeguard patient safety (<u>Id</u>.).

Defendants challenge the accommodation proposals of

Plaintiff's expert, Dr. Geller, asserting that all such proposals fail to account for patients' safety and fail to present any reasonable time frame (<u>Id</u>.). Defendants indicate their expert, Dr. Swikert, found Dr. Geller's report unreasonable because its proposed accommodations would significantly take away time and resources from doctors and patients, as well as take away from educational educational opportunities for other residents (<u>Id</u>.). Dr. Swikert also found Plaintiff's proposals would involve extensive patient care coverage issues and take at a minimum months to accomplish (<u>Id</u>.).

In light of these facts and the importance of patient safety, Defendants assert no reasonable accommodation exists to support Plaintiff in their program without posing a risk of compromised patient care (<u>Id</u>.). As a result, Defendants maintain they should be provided deference in their decision to terminate Plaintiff and are entitled to summary judgment as a matter of law (<u>Id</u>.).

## IV. Analysis

At issue in this case is whether a reasonable jury could find Plaintiff suffers from a disability within the meaning of the ADA. Also at issue is whether there exists any possible reasonable accommodation for Plaintiff's condition, such that he could perform the duties in the FMRP. Finally, Plaintiff

questions whether Defendants' actions in response to his request for an accommodation amounted to a good faith interactive process, and whether Defendants discriminated against him by failing to provide him the same opportunity for remediation as similarly-situated residents, on account of his disability (doc. 43).

For an individual to be disabled within the meaning of the ADA, they must have: "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102. Although no court has directly addressed whether Asperger's Syndrome falls under this definition, one court provided a persuasive analysis in a case involving autism. There, the court held an employee could not be denied benefits for his son's autism because the disorder is recognized as a disability within the meaning of the ADA. Morgenthal v. AT&T, No. 97 Civ. 6443 (DAB), 1999 U.S. Dist. LEXIS 4294, *8 (S.D.N.Y. Apr. 5, 1999). To reach this conclusion, the court relied on 24 CFR 9.103, which states:

> an individual with a disability means any person who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. As used in this definition, the phrase:
>
> (1) "Physical or mental impairment" includes:
>
> (ii) Any mental or psychological disorder, such as mental retardation,

> organic brain syndrome, emotional or
> mental illness, and specific learning
> disabilities. The term "physical or
> mental impairment" includes, but is not
> limited to, such diseases and conditions
> as orthopedic, visual, speech, and
> hearing impairments, cerebral palsy,
> autism. . . mental retardation,
> emotional illness. . .

Id.

The Court finds no genuine dispute that the record shows Plaintiff suffers from a disability within the meaning of the ADA. The record shows Plaintiff has had serious and ongoing limitations with the major life activity of social interaction skills. Based on Dr. Hartmann's assessment and multiple supervisor evaluations, the Court finds Plaintiff's Asperger's Syndrome amounts to a "mental impairment." 42 U.S.C. § 12102.

Having concluded that Plaintiff's condition qualifies as a disability, the Court proceeds to the question of whether there is any genuine dispute as to whether Plaintiff is otherwise qualified for the FMRP position with reasonable accommodation. The Court does not find that Plaintiff's proposed accommodation of "knowledge and understanding" on the part of Defendants' staff addresses the issue raised by Defendants about patient safety. The applicable code section, 29 C.F.R. § 1630.2(r), defines "direct threat," in this case as relating to patients, as "significant risk of substantial harm to the health or safety of the individual or others". The determination involves consideration of the duration of the risk, the nature and the

severity of potential harm, the likelihood that potential harm will occur, and the imminence of the potential harm. 29 C.F.R. § 1630.2(r). The Court finds no genuine dispute that Defendants, in exercising reasonable medical judgment about Plaintiff's condition, have proffered legitimate concerns that Plaintiff's condition presents unacceptable long-term risks in the context of the medical work he seeks to perform. The very nature of the medical profession requires solid communication skills with patients; fundamental problems with such communication make likely the potential of harm to the health or safety of others.

Plaintiff also questions whether Defendants engaged in a good faith interactive process to find a reasonable accommodation for his disability. The Court finds no dispute that Defendants offered to assist Plaintiff in obtaining a pathology position, but that Plaintiff declined such assistance and opted rather to contest his dismissal. Defendants' offer comports with their assertion that their actions were grounded in concerns for patient safety. The Court finds no genuine issue that Defendants acted in good faith.

Plaintiff argues that his expert reports show Defendants could have developed a suitable remediation program to accommodate his disability. However, the Court finds well-taken Defendants' position that Plaintiff's expert reports neither take into account a reasonable time-frame for proposed acccommodations

nor address concerns about patient safety. The Court finds Defendants' expert opinion uncontested that Plaintiff's requested accommodations are unduly burdensome given Defendants' obligations to other residents, doctors, and patients. As Plaintiff has not genuinely addressed these concerns or shown evidence of bad faith on the part of Defendants, the Court finds Plaintiff not "otherwise qualified" as a matter of law and holds Defendants did not deny Plaintiff a reasonable accommodation on account of his disability.

The Court's analysis of Plaintiff's disability discrimination claim is simplified, as its finding that Plaintiff is not "otherwise qualified," with or without reasonable accommodation, results in the failure of such claim as a matter of law. Although the Court need not reach the question, it further finds that Plaintiff's claim that similarly-situated residents received more favorable treatment falls flat, as the remediation proposed for such residents involved discrete time-frames. Defendants did not treat such residents more favorably because they lacked Plaintiff's limitations; rather Defendants offered such residents short-term remediation, a remedy that no evidence in the record shows could address Plaintiff's limitations.

Finally, although the Court agrees Defendants acted in

good faith in dismissing Plaintiff, and had a legitimate basis in doing so, the Court does not find well-taken Defendants' contention that Plaintiff misrepresented his prior experience in his application for a residency. Such claim is not at all supported by the evidence, as established in Plaintiff's Response. Plaintiff concealed no evidence and acted in good faith when he applied for a residency at TCH.

**V. Conclusion**

Having reviewed this matter, the Court finds no genuine issue of material fact as to Plaintiff's claims such that Defendants must prevail as a matter of law. <u>Patton</u>, 8 F.3d 343, 346 (6th Cir. 1993). As sympathetic as the Court is to Plaintiff's clearly-established disability, the Court finds Defendants acted legitimately in terminating Plaintiff's employment. Plaintiff has not shown that he is "otherwise qualified" for the position he seeks by proposing a reasonable accommodation. Nor does the Court find bad faith in Defendants' offer to assist Plaintiff to obtain a pathology position. Defendants cannot be expected to fundamentally change their program to accommodate Plaintiff with open-ended and intensive monitoring. <u>Kaltenberger</u>, 162 F.3d 432 (6th Cir. 1998). Under these circumstances, and particularly with a view toward patient safety, the Court finds Defendants' motion well-taken.

Accordingly, the Court GRANTS Defendants' Motion for

Summary Judgment (doc. 28), VACATES the previously scheduled final pretrial conference and trial dates, and DISMISSES this case from the Court's docket.

SO ORDERED.

Dated: August 3, 2009        /s/ S. Arthur Spiegel
                             S. Arthur Spiegel
                             United States Senior District Judge